IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL S. ROBERTS          :
3794 Douglass Avenue        :
Memphis, TN 38111           :
                            :   Civil Action No.
          and               :
                            :   **JURY TRIAL DEMANDED**
ANN POE                     :
2437 Marathon Lane          :
Fort Lauderdale, FL  33312  :
               Plaintiffs,  :
                            :
                            :
     v.                     :
                            :
JANET NAPOLITANO, in her official        :
capacity as Secretary of Homeland Security  :
U.S. Department of Homeland Security     :
Washington, DC  20528       :
                            :
JOHN S. PISTOLE, in his official capacity   :
as Administrator of the Transportation   :
Security Administration     :
601 S. 12th Street          :
Arlington, VA  20598        :
               Defendants.  :

## COMPLAINT

Plaintiffs Michael S. Roberts and Ann Poe, by and through their attorneys,

Drinker Biddle & Reath LLP, bring this action against defendants Janet Napolitano and

John S. Pistole in their official capacities as Secretary of Homeland Security and

Administrator of the Transportation Security Administration, respectively, and in support

thereof aver as follows:

### INTRODUCTION

1.     Michael S. Roberts and Ann Poe (collectively, "Plaintiffs") – two veteran

commercial airline pilots – bring this action under the Fourth Amendment of the United

States Constitution to enjoin the Department of Homeland Security ("DHS") and the

Transportation Security Administration ("TSA") (collectively, "Defendants") from

continuing to unlawfully use whole body imaging ("WBI") technology and newly-

implemented enhanced pat-down procedures as the first line of airport security screening

in the United States.

2.      Plaintiffs in this action are two commercial airline pilots who together

have nearly 40 years of piloting experience and more than 20,000 hours of combined

flight time.  As American pilots, Plaintiffs are deeply concerned with airline security.  At

the same time, however, Plaintiffs are unwilling to undergo unnecessarily invasive and

degrading practices merely in the name of security if doing so would violate

constitutionally protected rights.  WBI scanners and enhanced pat-down procedures,

when employed as primary means of airline traveler screening, violate such rights.

3.      Today, WBI scanners and enhanced pat-downs are being used by the

Defendants as the primary means of airline traveler screening in airports throughout the

United States.  Where deployed, WBI scanners are the true first line of screening.  This

technology allows a TSA officer to see beneath an individual's clothing and view a

graphic and detailed visual image of a person's body, including the contours of his or her

genitals.  It is only when an individual refuses to undergo this screening method that she

is presented with an alternative screening option, the enhanced pat-down.  Under the

newly implemented enhanced pat-down, a TSA officer slides his or her hands over an

individual's breasts, buttocks, groin, and inner thighs, and inserts his or her fingers *inside*

the entire circumference of the pants' waistband.

4.    Although it is well established that subjecting airline passengers to limited searches designed to detect weapons and explosives is consistent with the Fourth Amendment, it is equally well established that such searches must be reasonable. The new full-body scanning and enhanced pat-down screening regime implemented by the Defendants fails to meet this standard and is thus violative of the Fourth Amendment. It further forces travelers who wish to fly to choose between the lesser of two evils: submit to a virtual strip search, or suffer the indignity of allowing an unknown officer to literally place his or her hands in your pants.

5.    Given their high regard for their own Fourth Amendment rights and privacy interests, both Mr. Roberts and Ms. Poe have refused to make this decision. Instead, these two pilots have objected to participating in either screening method, and as a result, cannot fly out of airports which utilize these screening methods. Both Mr. Roberts' and Ms. Poe's livelihood – which is now dependent on the repeal of Defendants' intrusive policies – is at stake.

## PARTIES

6.    Plaintiff Michael S. Roberts is a pilot for ExpressJet Airlines, Inc., which is based in Houston, Texas. Because of his unwillingness to undergo WBI scanning or enhanced pat-down procedures, Mr. Roberts made the difficult choice to take an unpaid administrative leave. A father of six children, Mr. Roberts is a United States Citizen who resides in Memphis, Tennessee.

7.    Plaintiff Ann Poe, a First Officer pilot on the Boeing 777, is one of the first 100 women commercial airline pilots in the United States. Distinguished with a Type rating on the 777, Ms. Poe has been in the airline industry for well over 35 years

and, as a pilot for Continental Airlines, regularly flies large commercial airliners to various destinations across Europe and Asia. Ms. Poe is a United States Citizen and resident of Florida.

8.    Defendant Janet Napolitano is the Secretary of the Department of Homeland Security ("DHS"), the governmental body which oversees the Transportation Security Administration ("TSA"). As head of the DHS, Secretary Napolitano has authority over TSA policies, procedures, and practices relating to airline and airport security measures, including those challenged in this lawsuit. Defendant Napolitano is sued in her official capacity.

9.    Defendant John S. Pistole is the Administrator of the Transportation Security Administration. As the TSA Administrator, Mr. Pistole has authority over TSA policies, procedures, and practices relating to airline and airport security measures, including those challenged in this lawsuit. Defendant Pistole is sued in his official capacity.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim for relief arises under the Constitution of the United States.

11.    Venue is appropriately vested in this Court pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(e), as the District of Columbia is a judicial district in which at least one defendant resides, and because a substantial part of the acts or omissions giving rise to the claims herein occurred in the District of Columbia.

## BACKGROUND

**A.    Advent and Use of Whole Body Imaging ("WBI") Scanners**

12.    In the years between 2001 and 2009, most airports in the United States used a combination of walk-through metal detectors, metal-detecting wands, and traditional (or back-of-the-hand) pat-downs as primary traveler screening methods.

13.    During the Spring of 2009, the DHS made a determination that Whole Body Imaging ("WBI") scanners, which were previously only deployed for secondary screening in limited pilot projects, would be utilized in the future as the primary screening technique in U.S. airports.

14.    Since that determination, the DHS has rapidly deployed, and continues to rapidly deploy, WBI scanners throughout U.S. airports. By the end of December 2010, 491 machines are scheduled to be deployed in the U.S. An additional 500 machines are scheduled to be deployed in 2011. On information and belief, WBI full-body scanners will become the primary and first means of screening at most U.S. airports by 2012.

15.    The DHS and TSA have deployed two types of WBI scanning devices: those that use millimeter wave technology, and those that use backscatter x-ray. No matter the type of device used, the purpose and effect is the same: WBI scanners use technology that enables screeners to see beneath individuals' clothing and view a graphic and intrusive level of detail, including the contours of a person's genitalia. When an individual enters the full-body scanner, the device captures a detailed, rotating, three-dimensional image of an individual's unclothed body which is viewed in real-time by TSA personnel in another room.

16.     Many have described use of WBI technology as a "virtual strip search." Not only does WBI technology expose the body as if it is unclothed, but on information and belief, it goes much further:  WBI technology can expose evidence of mastectomies, menstruation, colostomy appliances, large scars, catheter tubes, penile implants and other internal prosthetic devices.  On this level, the WBI scanning may be viewed as even more intrusive than a traditional strip-search.

17.     Where utilized, these scanners are a first means of airport security for all persons flying out of U.S. airports, even if that person is a child.

**B.     Advent and Use of Enhanced Pat-Down Procedures**

18.     Under new TSA procedures, if a person chooses to "opt out" of a WBI scan, that individual may select to undergo the so-called "enhanced pat-down."  This is the sole alternative offered to individuals who decline to enter a WBI scanner.

19.     In late October 2010, the TSA began implementing the new pat-down procedure.  This new pat-down is significantly more invasive and intrusive than the former pat-down in that, among other things, the officer literally places his hands inside the traveler's pants.

20.     This new procedure replaces the TSA's former back-of-the-hand pat-down procedure which had been in effect since at least 2002.  Under the previous technique, a TSA officer would merely brush the back of his or her hand along the traveler's clothing to feel for weapons or other contraband.

21.     Under the new "enhanced pat-down" procedure, TSA officers use their palms and fingers to conduct a detailed inspection of a traveler's entire body.  On information and belief, the officer runs his or her open hands and fingers over most parts

of an individual's body including the breasts, and uses the back of the hands when touching the buttocks. Additionally, officers slide their hands all the way from the inner thigh up to the groin until the hand cannot venture any higher because it is literally stopped by the person's groin.

22. As part of the enhanced pat-down, a TSA officer will also insert his fingers *into* an individual's pants and move his fingers, while still inside the pants, around the entire circumference of the waistband.

### C. Pilot Michael Roberts was Denied to Fly on October 15, 2010

23. On Friday, October 15, 2010, Michael Roberts – who was dressed in his pilot's uniform at the time – attempted to pass through the security checkpoint at Memphis International Airport ("MEM") as part of his regular commute to work.

24. Mr. Roberts is very familiar with MEM and this particular checkpoint, as he lives in Memphis and flies in and out of that city on a regular basis. In fact, Mr. Roberts has passed through this same security checkpoint approximately once per week for the last four and one-half years, or well over 200 times.

25. After Mr. Roberts loaded his carry-on bags onto the X-ray scanner belt that Friday morning, a TSA agent asked Mr. Roberts to remove his shoes and enter the WBI scanner, which had just recently been deployed at MEM. Prior to October 15, Mr. Roberts had never seen a WBI scanner at MEM.

26. Mr. Roberts responded that he did not wish to participate in the full-body imaging. For Mr. Roberts, permitting unknown government officials to see what is private to almost everyone else in the world was an overly intrusive assault on his personal privacy rights and liberties.

27.    The TSA agent then directed Mr. Roberts through the metal detector which, at the time, was still in place at the security checkpoint. Mr. Roberts passed through the metal detector without triggering the alarm or giving any other reason for suspicion, just as he had done countless times in the past.

28.    Not finished, the TSA agent then called out to her colleagues and reported on her hand-held radio that they had an "opt-out." Mr. Roberts was informed that, despite passing through the metal detector and wearing his pilot's uniform, he would have to go through a stringent pat-down. Mr. Roberts declined, feeling that this so-called alternative was not a valid alternative at all: the option of having one's entire body groped by an agent was no better than being seen unclothed by an agent.

29.    The second agent and a third agent informed Mr. Roberts that he would have to be patted down or go through the WBI scanner, or else he would be unable to fly. Mr. Roberts asked the agents whether he was suspected of concealing something dangerous (despite passing through the metal detector without alarm). The agents responded that they were just doing their job.

30.    After Mr. Roberts and the TSA agents reached an impasse, airport police were summoned. Mr. Roberts was asked to leave. Mr. Roberts complied with the officers' request and, as a result, was unable to fly his route on October 15, 2010.

31.    Mr. Roberts believes that use of WBI scanners and enhanced pat-down procedures as primary means of air traveler screening is an infringement on his civil rights and liberties, as well as those of his six children. Because of this belief, Mr. Roberts will not fly out of any airports that utilize WBI scanners or enhanced pat-downs as a first means of security screening.

32.     Mr. Roberts' is now on unpaid administrative leave because of his refusal to enter the WBI scanners. As of November 1, Mr. Roberts' family health insurance policy offered through his company has been discontinued.

33.     Without his job, Mr. Roberts is no longer able to adequately provide for his family. It remains unknown whether Mr. Roberts will be able to reclaim his job and love for commercial airline flying.

34.     Mr. Roberts has suffered damages, and will continue to suffer damages, as a result of the Defendants' use of WBI scanners and enhanced pat-downs as a first line of air traveler security screening.

**D.     Pilot Ann Poe was Denied to Fly on November 4, 2010**

35.     At approximately 12:30 PM on Thursday, November 4, 2010, Continental Airlines pilot Ann Poe arrived at the Fort Lauderdale-Hollywood International Airport ("FLL") as she had done many times in the past. Ms. Poe lives in the FLL area, and flies in and out of that airport on a regular basis.

36.     Ms. Poe was scheduled to fly approximately 300 passengers and crew to Mumbai, India. Wearing her Continental pilot uniform, Ms. Poe approached the security checkpoint.

37.     On this day, the agents at the FLL security checkpoint were screening travelers via WBI scanners as well as traditional walk-through metal detectors. Travelers could choose which line (and which screening device) to enter.

38.     Ms. Poe chose to enter the walk-through metal detector. Upon entering, Ms. Poe – who has an artificial hip – triggered the metal detector's alarm, just as she had repeatedly done in the past.

39.    Based on past experience, Ms. Poe anticipated that a TSA agent would run a metal-detecting wand around her body to determine the location of the metal, and thereafter allow her to pass through the checkpoint. Ms. Poe was quite familiar with this routine and did not anticipate any deviations from the norm.

40.    Ms. Poe asked that a female agent perform the wanding. A female agent walked over and told Ms. Poe that, as a result of new regulations, TSA was no longer wanding air travelers (even though several wands were visible and in the area). Instead, she explained, Ms. Poe would have to be frisked.

41.    The TSA agent explained that she would touch Ms. Poe's breasts, buttocks and pelvic area, and run her hands up Ms. Poe's thighs until her hands could not go any further.

42.    Ms. Poe told the TSA agent that the frisking she described was tantamount to molestation, and politely refused the enhanced pat-down. She asked to speak with a supervisor.

43.    A supervisor that Ms. Poe recognized from previous security screenings arrived and informed Ms. Poe that she would have to go through the enhanced pat-down or, in the alternative, go through the WBI scanner.

44.    Ms. Poe again refused. She informed the supervisor that she was concerned about the radiation risk associated with WBI scanners and believed that the violation of medical privacy was too great. Ms. Poe, like many individuals with internal prosthetics or implants, prefers to keep her medical condition a private matter.

45.    Ms. Poe informed the supervisor she would consent to a wanding, as she had done many times in the past. The supervisor said TSA was no longer wanding individuals.

46.    Ms. Poe asked the TSA personnel to call Continental's head of security, the chief pilot's office, and the base manager. A FLL manager arrived soon thereafter and offered to be a witness to the pat-down, which she suggested, could occur in a private room. Ms. Poe explained that use of a witness or a private room made no difference: the point is she would be molested regardless.

47.    TSA personnel, after swabbing Ms. Poe's hands and carry-on bags, refused to allow Ms. Poe to pass through security and escorted her out of the airport.

48.    Ms. Poe was emotionally traumatized by this two-hour long ordeal. She left the airport sick to her stomach, fatigued, and emotionally drained.

49.    Ms. Poe objects to the use of WBI scanners and enhanced pat-downs as a first line of airport screening. In her eyes, the pat-down is a physical molestation and the WBI scanner is not only intrusive, degrading and potentially dangerous, but poses a real and substantial threat to medical privacy. Although the enhanced pat-down in this instance was not an initial screening measure, Ms. Poe is aware that a growing number of airports for which she travels do utilize both WBI scanners and enhanced pat-downs as a primary means of screening. Given her objections, Ms. Poe cannot fly out of these airports.

50.    Ms. Poe cannot fly out of FLL, her home base airport. Despite Ms. Poe's need to support both herself and her elderly mother, as well as her passion for flying, Ms. Poe has not flown since this incident. In fact, Ms. Poe took off on November 11, the next

date on which she was scheduled to fly out of FLL.  Ms. Poe, a gifted veteran pilot, will continue to take off work as long as the existing regulations are in place.  She is concerned that if the existing regulations stay in place, she may not be able to fly a commercial aircraft again.

51.    Ms. Poe has suffered damages, and will continue to suffer damages, as a result the Defendants' use of WBI scanners and enhanced pat-downs as a first line of air traveler security screening.

## COUNT I

### United States Constitution
### Fourth Amendment

52.    Plaintiffs hereby incorporate each of the allegations above as if set forth herein at length.

53.    Plaintiffs are entitled to judicial relief under 5 U.S.C. § 702, as they have suffered and are suffering a legal wrong because of the actions of an agency or an officer or employee thereof.

54.    In the last year, Defendants have implemented a sea change in airport screening measures.  They have abrogated effective and privacy-protecting measures such as walk-through metal detectors, metal-detecting wands, and back-of-the-hand pat-downs, and put in their place virtual strip searches and crude full-body pat-downs.  Presented with a choice of WBI scanning or an enhanced pat-down as the primary means of screening, the modern air traveler in the United States is forced to choose between the lesser of two evils, neither of which should be constitutionally protected.

55.    The Fourth Amendment protects individuals from unreasonable searches and seizures.

56.     The TSA's use of WBI scanners and enhanced pat-downs on air travelers constitutes both a government-imposed search and seizure.

57.     These primary screening methods require that, in order to fly, an individual must either allow an unknown government agent to view them nude, or alternatively, allow an unknown government agent to perform an intimate and heavy-handed pat-down of one's most sensitive and private areas.  No matter which option is taken, a passenger's privacy rights, civil liberties, and freedoms are compromised by such an intrusive and overreaching search and seizure.

58.     Given the profane, degrading, intrusive, and indecent nature of these searches, they are patently unreasonable and violative of the Fourth Amendment.

59.     Both Michael Roberts and Ann Poe have elected to refrain from these unconstitutional searches, and as a result, both are currently unable to earn a livelihood in their chosen profession.  While Mr. Roberts and Ms. Poe greatly value airline security, both agree that such an infringement on our civil rights and liberties should not be permitted merely in the name of security.

PRAYER FOR RELIEF

WHEREFORE, Michael Roberts and Ann Poe respectfully request that this Court enter judgment in their favor and against the Defendants.  Further, Michael Roberts and Ann Poe respectfully request that this Court enter an order granting the following relief:

(a)     Permanently enjoining Defendants from continuing to use either WBI scanning technology or enhanced pat-downs as a first and primary means of screening for air travelers in the United States;

(b)     Declaring that the Defendants' policy of utilizing WBI scanning technology or enhanced pat-downs, or both, as a first and primary means of screening for air travelers in the United States is a violation of the Fourth Amendment to the United States Constitution;

(c)     Awarding damages to Michael Roberts as a result of Defendants' unconstitutional conduct, including compensatory and all other measures of damages legally allowed;

(d)     Awarding damages to Ann Poe as a result of Defendants' unconstitutional conduct, including compensatory and all other measures of damages legally allowed;

(e)     Awarding Michael Roberts and Ann Poe their costs and reasonable fees and expenses of their attorney pursuant to 28 U.S.C. § 2412; and

(f)     Awarding Michael Roberts and Ann Poe all such other equitable relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims that can be so tried.

Dated: November 16, 2010

Respectfully submitted,

_____

John D. V. Ferman
DC Bar No. 502520
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC  20005
(202) 842-8800
John.Ferman@dbr.com

Of Counsel:

Jason P. Gosselin
Bradford Barron
Alexander M. Brodsky
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103
(215) 988-2700
Jason.Gosselin@dbr.com
Bradford.Barron@dbr.com
Alexander.Brodsky@dbr.com

John W. Whitehead
Doug R. McKusick
THE RUTHERFORD INSTITUTE
Post Office Box 7482
Charlottesville, VA  22906
(434) 978-1789
johnw@rutherford.org
douglasm@rutherford.org

*Counsel for Plaintiffs Michael
Roberts and Ann Poe*